[Crim. No. 8217. Third Dist. July 13, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
CURLIE DAVID WRIGHT, Defendant and Appellant.

8

**COUNSEL**

Carl B. Shapiro, under appointment by the Court of Appeal, and Richard N. Shell for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel Carey and Michael H. Fabian, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**FRIEDMAN, Acting P. J.**—Defendant and his wife were charged with the murder of Leichen, their 29-month-old daughter. The jury acquitted the wife and found defendant guilty of involuntary manslaughter, a lesser included offense. Defendant appeals from the judgment.

Medical examinations during Leichen's lifetime, as well as a postmortem, revealed a variety of external bruises and scars, skull fractures, rib fractures, a pelvic fracture and ruptures of the bowel and mesenteric sheath. Two ruptures of the small bowel had caused fatal peritonitis. In the opinion of medical experts the child had suffered numerous beatings and blows and was a victim of the battered child syndrome.

### I

Initial issue is the propriety of a jury instruction defining involuntary manslaughter. The instructions defined second degree murder characterized by implied malice; described implied malice to include a killing resulting from commission of a felony inherently dangerous to human life; designated the crime defined by Penal Code section 273a, subdivision (1), as a felony inherently dangerous to human life;[1] included a reading of section 273a, subdivision (1).

The court then gave the instruction upon which defendant's attack focuses. It had been extracted from CALJIC No. 8.45 (1972 rev.). As given to the jury it declared: "Involuntary manslaughter is the unlawful killing of a human being without malice aforethought and without an intent to kill. ¶ A killing is unlawful within the meaning of this instruction if it occurred: ¶ During the commission of a misdemeanor

---

[1]Penal Code section 273a in its entirety, provides:

"(1) Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding 1 year, or in the state prison for not less than 1 year nor more than 10 years.

"(2) Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health may be endangered, is guilty of a misdemeanor."

which is *inherently dangerous to human life,* namely, the offense of Section 273(a)(2) of the Penal Code." (Italics added.)

In an ensuing instruction the court read to the jury the substance of Penal Code section 273a, subdivision (2). (See fn. 1, *ante.*)

There were no instructions defining first degree murder, voluntary manslaughter or involuntary manslaughter committed through criminal negligence.

■ We sustain the assignment of error. A homicide resulting from the commission of a felony inherently dangerous to life (other than the six felonies resulting in first degree felony murder) constitutes at least second degree murder. (*People* v. *Ireland,* 70 Cal.2d 522, 538 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Phillips,* 64 Cal.2d 574, 582-586 [51 Cal.Rptr. 225, 414 P.2d 353].) When an unintended killing results from an unlawful act not amounting to a felony, the manslaughter statute[2] comes into play. Settled judicial interpretation has tempered the statutory definition of involuntary manslaughter: when the killing results from an "unlawful act, not amounting to a felony," the crime is involuntary manslaughter only if the act is dangerous to human life or safety. (*People* v. *Stuart,* 47 Cal.2d 167, 173 [302 P.2d 5, 55 A.L.R.2d 705].)

Penal Code section 273a punishes the acts generally classed as child abuse. The statute's pre-1965 version set out a unified, if compound, definition of the offense, which included acts endangering the child's "life or limb." A 1965 amendment cast the statute in its present form. (Fn. 1, *ante.*) Subdivision (1) describes an offense committed *under circumstances or conditions likely to produce great bodily harm or death* and punishable by imprisonment in the state prison or a county jail.[3]

---

[2]Penal Code section 192 provides in part: "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion.

"2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle.

"3. In the driving of a vehicle—

". . . . . . . . . . . . . . . . . ."

[3]Such a crime is a felony until its status is changed by a judgment imposing punishment other than a state prison sentence. (Pen. Code, § 17, subd.(b); *People* v. *Banks,* 53 Cal.2d 370, 381 [1 Cal.Rptr. 669, 348 P.2d 102].

Subdivision (2) describes an offense punishable as a misdemeanor, committed under circumstances *other than* those likely to produce great bodily harm or death.

The crime described in Penal Code section 273a, subdivision (2), is *other than* one which is likely to produce great bodily harm or death. Section 273a, subdivision (2), thus excludes child abuse which threatens great bodily harm or death. Although nice verbal distinctions are possible, there is no practical difference between a crime which is likely to produce great bodily harm or death and one inherently dangerous to life. Both involve criminal acts which, by their very nature, threaten death. In determining which crimes are inherently dangerous to human life, the courts look to the elements of the crime in the abstract, not the particular "facts" of the case. (*People* v. *Nichols,* 3 Cal.3d 150, 163 [89 Cal.Rptr. 721, 474 P.2d 673].) The prime distinction between felony murder and non-negligent involuntary manslaughter is this: the former results from a felony inherently dangerous to life, the latter from an unlawful act other than a felony (e.g., a misdemeanor) which is inherently dangerous to life.[4] By force of its express exclusionary clause, the misdemeanor described in section 273a, subdivision (2), is not one which is inherently dangerous to life. The trial court erred in instructing the jury otherwise.[5]

---

[1]This conclusion was foreshadowed by a dictum in *People* v. *Ramsey,* 17 Cal.App.3d 731, 735 [95 Cal.Rptr. 231]. There the court declared: "The [trial] court here gave basic instructions that involuntary manslaughter involved an unlawful killing without malice aforethought during the commission of a misdemeanor which is inherently dangerous to human life or safety and, further, the unlawful act or omission must be committed with criminal intent or criminal negligence. The court went on, however, to instruct on misdemeanors which are not inherently dangerous to life or safety . . . . We do not approve these . . . instructions . . . ."

[5]Arguably, then, an unintended killing resulting from a misdemeanor not inherently dangerous to life would be completely outside the definition of non-negligent, involuntary manslaughter. If an unintended killing caused by an inherently dangerous misdemeanor is involuntary manslaughter, in what category of crime does the law place an unintended killing caused by a misdemeanor which is not dangerous to life? In *People* v. *Morales,* 49 Cal.App.3d 134, 144-145 [122 Cal.Rptr. 157], the court noted the intellectual difficulty posed by bringing non-negligent killings within the involuntary manslaughter definition when the underlying crime, felony or manslaughter, is not dangerous to life. A number of cases have postulated instances of involuntary manslaughter within the reach of the first sentence of section 192 but not literally conforming to the definition of involuntary manslaughter. (*People* v. *Mosher,* 1 Cal.3d 379, 385, fn. 1 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Conley,* 64 Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Morales, supra;* see McBride, *Something New, Non Statutory Crime?* 44 State Bar J. 579.) Section 192 of the Penal Code stands in need of legislative overhaul.

Although erroneous, the instruction did not cause a miscarriage of justice and is not ground for reversal. (Cal. Const., art. VI, § 13.) A miscarriage of justice should be declared only when the reviewing court examines the entire record and finds a reasonable probability that a result more favorable to the appellant would have been reached in the absence of the error. (*People* v. *Williams,* 13 Cal.3d 559, 563 [119 Cal.Rptr. 210, 531 P.2d 778].) In this case the initial question for the jury was whether either defendant was the actor who caused the child's death. By its verdict the jury excluded the wife, identified defendant as the actor and found that his actions had been the proximate cause of death. Uncontradicted evidence established that the child had suffered a series of blows and beatings of sufficient force to cause fractured bones and severe damage to the internal organs.

Once the jury identified defendant as the agent of injury, the evidence pointed unerringly to his violation of Penal Code section 273a, subdivision (1), i.e., the infliction of injuries under circumstances likely to produce great bodily harm or death. That violation constituted a felony inherently dangerous to life. Once defendant was identified as the agent of death, the evidence fully established his guilt of second degree felony murder. (*People* v. *Ireland, supra; People* v. *Phillips, supra;* see also, *People* v. *Steger,* 16 Cal.3d 539, 553 [128 Cal.Rptr. 161, 546 P.2d 665].)

As we examine the record further, we find that the instructions proposed by the parties and given by the court offered the jury no options other than second degree murder, manslaughter and acquittal. After the jury identified defendant as the agent of death, there was no reasonable probability of acquittal. Whether the manslaughter verdict was an act of mercy or an expression of reluctance to return a second degree murder verdict for an unintentional killing, we do not know. Defendant at any rate was the beneficiary, not the victim, of the erroneous instruction.

II

■ Defendant assigns error in the trial court's failure to give a *sua sponte* jury instruction making available a verdict of involuntary manslaughter of the criminal negligence variety. "It is settled that in criminal cases, even when not requested, the court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles

closely and openly connected with the facts before the court, and which are necessary · for the jury's understanding of the case. [Citations.]" (*People* v. *Wilson,* 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820].)

The prosecution produced circumstantial evidence tending to prove that defendant or his wife or both had severely abused and beaten Leichen. Defendant and his wife took the stand. Both denied striking Leichen; each denied any belief that the other had abused or injured her; each vouchsafed the possibility of falls or other accidents and of rough treatment by her brother (who was 14 months older than Leichen). Three physicians took the stand; all diagnosed the events as an instance of the battered-child syndrome and rejected accidental injury as a source of death. (See *Landeros* v. *Flood,* 17 Cal.3d 399, 409 [131 Cal.Rptr. 69, 551 P.2d 389].) The two defendants were represented by separate attorneys. There is no record that either attorney espoused a theory of manslaughter ·by negligence; neither offered an instruction defining that offense.[6]

Penal Code section 192 (fn. 2, *ante*) describes involuntary manslaughter of the negligent variety as that which results from "the commission of a lawful act which might produce death . . . without due caution and circumspection." This statutory language describes the equivalent of criminal negligence; ordinary carelessness will not suffice; the negligence must be aggravated, culpable, gross or reckless, amounting to a disregard of human life or an indifference to consequences. (*People* v. *Penny,* 44 Cal.2d 861, 869 [285 P.2d 926].)

The evidence summarized above does not "closely and openly" suggest that defendant was criminally negligent in his treatment of the child or in awareness of his wife's treatment of the child. (*People* v. *Wilson, supra.*) Rather, the only penal provisions "closely and openly" evoked by the evidence were those covering deliberately inflicted violence. Possibly the evidence supported an inference of criminal negligence, warranting an instruction on negligent manslaughter had the defense requested one; that possibility did not trigger a *sua sponte* duty of the trial judge to instruct on that crime. (See *People* v. *Sedeno,* 10 Cal.3d 703, 716-717 [112 Cal.Rptr. 1, 518 P.2d 913].)

Defendant seeks support in *People* v. *Peabody,* 46 Cal.App.3d 43 [119 Cal.Rptr. 780]. There the court reversed a mother's child abuse

---

[6]We do not second-guess the attorneys' tactical choices and disavow any critical implication.

conviction of violating Penal Code section 273a, subdivision (1), because the trial judge had failed to instruct on criminal negligence. In *Peabody,* the prosecution sought to show that the mother had, in statutory parlance, "willfully permitted" the child's physical injury by its father. Here, the defendant was charged with personally injuring the child and not with willfully permitting its injury by another. The *Peabody* demand for an instruction on criminal negligence is inappropriate where the evidence points to direct infliction of injury by the defendant before the court. (*People* v. *Atkins,* 53 Cal.App.3d 348, 361 [125 Cal.Rptr. 855].)

### III

In cross-examining defendant the prosecution utilized several statements or admissions he had made in the course of police interrogation after the child's death. Defendant objected, claiming coercion. The trial court found his statements voluntary. Defendant makes the charge of coercion on appeal.

Evidentiary use of an involuntary confession or admission is a denial of due process; the coercion may be physical or psychological; the totality of circumstances must be taken into account; the reviewing court must examine the uncontradicted facts and determine independently whether the statements were voluntary. (*People* v. *Haydel,* 12 Cal.3d 190, 197-198 [115 Cal.Rptr. 394, 524 P.2d 866].)

On voir dire Sergeant Kelley, the investigating officer, testified that after the child's death he requested the child's parents to come to the sheriff's office for an interview; he also had Leichen's brother and sister taken to the Medical Center for physical examinations. On December 1, the day of the first interviews, he spoke to each parent separately, then took them home. Defendant's interview lasted for an hour. On the next day Kelley interviewed the parents again, defendant for 30 minutes and later for an additional 5 minutes. In the course of these interviews he told the parents that the two children would be held in "protective custody" pending an inquiry whether Leichen had died as a result of beatings; he advised defendant of his "*Miranda*" rights and secured a signed waiver; he described defendant's demeanor as "very calm."

During his three interviews with Sergeant Kelley, defendant made one admission and several exculpatory statements attempting to explain Leichen's injuries. At one point his wife had told the officer of an occasion when she had returned home and Leichen had said, "Daddy

pow." Defendant admitted to Sergeant Kelley that the term "pow" was the Chinese equivalent of "hit;" that "Daddy pow" meant "Daddy hit." This admission was the only inculpatory statement defendant made. The statements were used by the prosecutor in defendant's cross-examination.

Defendant argues that the circumstances of the interrogation—immediately after the death of one child and while the other two children were being withheld from their parents—did not promote the rational intellect and free will which are the elements of voluntariness. His argument misstates the rule. The question is not whether the combined circumstances promote or contribute to rational intellect and free will, but whether they overbear these attributes. (See *People* v. *Haydel, supra,* 12 Cal.3d at p. 198.) There was no prolonged period of questioning; no deceit; no threats and no promises of lenience. The assumption of public custody over the other two children was not used as a threat; nor did Sergeant Kelley offer to return the two children to the parents in exchange for their statements. (See *People* v. *Steger, supra,* 16 Cal.3d at p. 550.) The transcript portrays defendant as a person of intelligence, able to choose his words with care. That he was given the *Miranda* warning and signed a waiver of his rights to silence and to counsel is circumstantial evidence of voluntariness. In view of the totality of circumstances, defendant's claim of coercion fails.

## IV

Finally, defendant charges a prejudicial destruction of evidence. Sergeant Kelley recorded his December 1 interviews with the two parents on a cassette recorder; used the recorded statements as the basis for a report; then, as was his practice, erased the tape for reuse the next day. The same tape was used for the next day's interviews with Mr. and Mrs. Wright. Erasure of the December 1 tape formed the basis of a defense objection to any evidence of the December 1 statements, an objection which the trial court overruled.

We extract the guiding rule from *People* v. *Hitch,* 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], and *People* v. *Ruthford,* 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341]. ■ Law enforcement officers are under a duty to preserve material evidence; its intentional suppression may constitute a violation of due process irrespective of the authorities' good or bad faith; where, as here, evidence has been destroyed, the court has no independent means of deciding whether it would have been material;

at that point, the court's disposition depends upon the good or bad faith attending the suppression or destruction; if the authorities acted in good faith, the defense will be called upon to make a showing of substantial materiality. (*People* v. *Hitch, supra,* 12 Cal.3d at pp. 645, 649-653; *People* v. *Ruthford, supra,* 14 Cal.3d at p. 409.) Even after this showing is made, an appellate court will not reverse the conviction if the prosecution establishes that the evidence was harmless beyond a reasonable doubt. (*People* v. *Ruthford, supra,* 14 Cal.3d at p. 409.)

Portable tape recorders are widely used in criminal investigations, both in headquarters and in field interrogations of suspects and witnesses. Law enforcement activities generate the incessant creation of recorded tapes whose future utility, to prosecution or defense, cannot be predicted. Some investigations blossom into full-fledged criminal prosecutions, others are as evanescent as snow upon the desert's dusty face. A few recordings may be transcribed; more will be erased when their temporary utility ends. Sergeant Kelley's erasure of the December 1 tape recording is not at all indicative of lack of good faith.

■ Defendant has made no showing that the destroyed tape had any substantial materiality. Such a showing was not beyond his means. His testimonial assertion that he had made statements inconsistent with those attributed to him by the cross-examiner would have supplied a measure of the erased recording's materiality. He made no such assertion. As revealed by the cross-examination, his exculpatory statements to Sergeant Kelley were consistent with his courtroom testimony, that is, a complete denial of guilt and the suggestion of possibilities of accidental injury to the child. He did not deny making the incriminating statement describing his understanding of the phrase "Daddy pow." His claim of injury through erasure of the tape is an abstraction without actual bearing on the case.

Judgment affirmed.

Regan, J., and Paras, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 6, 1976. Wright, C. J., was of the opinion that the petition should be granted.