[Crim. No. 19103. First Dist., Div. Two. Mar. 4, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
HARRIET JOSEPHINE AMMONS, Defendant and Appellant.

COUNSEL

Moran, Urich & Evans, Robert L. Moran, David O. Ledbetter, J. Brian McCauley and William F. Urich for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Ronald E. Niver and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

TAYLOR, P. J.—Defendant, Harriet Josephine Ammons, appeals[1] from a judgment finding her guilty of voluntary manslaughter (Pen. Code, § 192) and not guilty by reason of insanity, and committing her to Napa State Hospital (Pen. Code, § 1026) for four years, pursuant to *In re Moye* (1978) 22 Cal.3d 457 [149 Cal.Rptr. 491, 584 P.2d 1097]. She contends that: 1) the warrantless entry and search of her home were unlawful; 2) the evidence and information obtained as the result of the unlawful entry were fruits of the poisonous tree, and in any event, the court erred in ruling that they were properly admitted under the inevitable discovery rule; 3) her confession to her family physician was inadmissible; 4) the search warrant subsequently obtained was invalid as it was based on illegally obtained evidence; and 5) she was deprived of due process by the destruction of certain tape recordings. For the reasons set forth below, we have concluded that the judgment must be affirmed.

The record reveals the following pertinent facts: About 9:30 a.m. on Monday, July 11, 1977, Officer Joseph Ramos was dispatched to check on the welfare of one Joseph Ammons. Ernest Moya, Ammons' supervisor at Mare Island, had called the Napa police, as Ammons was several hours late for work. Ammons was a very punctual and conscientious employee who usually called in when he expected to be late and was rarely absent. Moya had called the Ammons home but received no response.

---

[1] The notice of appeal erroneously refers to judgments. The record indicates a single judgment dated October 27 and signed and filed on October 30.

Ramos proceeded to the Ammons' home, rang the doorbell and knocked on the door. The only response was a barking dog. He then stepped off the front porch, walked across the front yard and stepped over some shrubbery to look through the uncurtained front window. Ramos knocked on the window; only the dog responded. From the front window, Ramos saw a very neat house except for dog feces on the living room floor. The inside of the house, but not the floor, could have been observed through this window from the sidewalk on the street.

Ramos proceeded to the east side of the house, through a gate to the rear patio, which was enclosed by a six-foot fence. Ramos could not remember whether the gate was open or closed. At the rear of the house, Ramos opened the unlocked garage door and observed a Cadillac. He knocked on a locked rear door that provided entry from the garage into the house; again the barking dog was the only response. Ramos then proceeded to the master bedroom window but could not see anything as it was covered by drapes. He knocked on the bedroom window and once again only the dog responded. Ramos then went to the west side of the house and knocked on two windows through which he could see nothing unusual. After again receiving no response, he proceeded to the home of the neighbor on the east side, Robert Cleveland.

Cleveland stated that he had not seen the Ammons since Saturday morning and that the neighbor across the street, Mrs. Barbara Stoer, was a good friend of the Ammons. Ramos and Cleveland went across the street to talk to her. Mrs. Stoer also last saw the Ammons on the preceding Saturday. As the Stoers had seen no lights in the Ammons house on Sunday night, the Stoers concluded that no one was home. Mrs. Stoer also indicated that defendant was usually home on Monday mornings, and that the car parked in front of the Ammons home was defendant's; Mr. Ammons drove the Cadillac. Stoer was concerned as defendant had a heart condition for which she took medication; also, Mrs. Stoer usually "dog sat" for the Ammons when they were gone and they usually told her when they planned to be away.

The Stoers provided Ramos with the work telephone number of Ammons' daughter. Ramos telephoned, without success, as she was on vacation. Mrs. Stoer also told Ramos that the Ammons son worked at Mare Island but she doubted if he would know of their whereabouts, as that family relationship was strained.

After checking with the neighbor on the west side of the Ammons home, Ramos returned to the Ammons home with Cleveland. They rang the doorbell and knocked on the front door. The barking dog was the only response. Again they checked all of the other house windows which were locked and the check revealed nothing was astray.

Based on all of the above information, about 15-25 minutes after his initial arrival, Ramos concluded that someone in the house might be in great danger and he decided to enter. He later testified that this decision was based upon a "strong feeling."

With a piece of wire from the garage, Ramos slipped open the already half-latched bedroom window. He pulled the drapes aside and saw the Ammons lying side-by-side in the bed. Mr. Ammons was dead; defendant's breathing was shallow and labored. An ambulance was requested. The items seized that were admitted into evidence at trial were the murder weapon, a .38, the fatal bullet, a live bullet from the murder weapon, and an empty pill bottle found in the kitchen. Four photographs of the scene taken that morning were also admitted into evidence at trial.

Defendant was taken to the Queen of the Valley Hospital and did not regain consciousness until July 13. Dr. Roger Sward, a hospital physician and also the Ammons family doctor, spoke to her and asked her what happened. Although defendant was in intensive care in critical condition, she was lucid. Defendant indicated that she was angry at being alive and wanted her life support systems disconnected. She had taken a massive dose of meprobamate (Miltown). She told Dr. Sward, "I killed him. No other woman could have loved him as much as I." Dr. Sward was not acting as a police agent. Defendant admitted the homicide and relied on defenses of diminished capacity and insanity.

On July 12, 1977, Ramos and other Napa police entered the Ammons home to locate the telephone number of the Ammons daughter and to better enable Ramos to describe the scene as he found it. The house was under coroner's seal; the officers had no warrant. They took nothing but copied some telephone numbers.

On July 13, 1977, an officer entered the house with a search warrant based on Ramos' observations after the July 11 entry and defendant's statement to Dr. Sward. The evidence seized at this time was not admitted at trial. On July 14, 1977, a Napa police officer telephoned

Mare Island and asked if he needed a warrant to search the victim's desk. The Navy indicated that the desk was government property and seized some evidence. All the searches were upheld except the one of the victim's desk.

At the suppression hearing, the trial court found that Ramos' entry on July 11 without a warrant was reasonable and, therefore, lawful, on the basis of the totality of the circumstances.

We turn first to Ramos' entry into the Ammons home. ■ The Fourth Amendment to the federal Constitution and article I, section 13 of the state Constitution guarantee "'The right of the people to be secure in their persons, houses, papers, and effects' against unreasonable searches and seizures." (*Cleaver* v. *Superior Court* (1979) 24 Cal.3d 297, 302 [155 Cal.Rptr. 559, 594 P.2d 984].) A "search" within the meaning of these constitutional provisions occurs whenever a person's reasonable expectation of privacy is violated by governmental intrusion (*People* v. *Edwards* (1969) 71 Cal.2d 1096, 1100-1104 [80 Cal.Rptr. 633, 458 P.2d 713]).

The record indicates that at the suppression hearing, the trial court did not rule on the legality of Ramos' conduct prior to the entry through the bedroom window. As indicated above, after knocking on the front door the first time, Ramos walked through some shrubbery and looked in a front window. He then proceeded to the back where he walked through a gate, opened the unlocked garage door, and observed the Cadillac automobile. He then knocked on and looked through two windows on the side of the house. The People argue that each instance was a mere "attempt to contact" Ammons and, at most, a technical trespass, not subject to constitutional scrutiny.

■ A "search," as that term is used in the Fourth Amendment to the federal Constitution and in our own Constitution, implies some exploratory investigation or an invasion and a quest, a looking for or seeking out (*Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602, 605 [21 Cal.Rptr. 552, 371 P.2d 288]). The general rule is that if observations are made from a place to which the public is not expressly or implicitly invited, a search has begun (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 634, 638 [108 Cal.Rptr. 585, 511 P.2d 33]; *Mann* v. *Superior Court* (1970) 3 Cal.3d 1 [88 Cal.Rptr. 380, 472 P.2d 468]). ■ Thus, Ramos began to "search" when he left the front porch and began to look through the windows as defendant had a rea-

sonable expectation of privacy with respect thereto. (*Lorenzana, supra*, at p. 634, fn. 5.) Our Supreme Court in *Lorenzana*, relying on *Katz v. United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], said at page 638: "[T]he generic *Katz* rule permits the resident of a house to rely justifiably upon the privacy of the surrounding areas as a protection from the peering of the officer unless such residence is 'exposed' to that intrusion by the existence of public pathways or other invitations to the public to enter upon the property. This justifiable reliance on the privacy of the noncommon portions of the property surrounding one's residence thus leads to the *particular* rule that searches conducted without a warrant from such parts of the property *always* are unconstitutional unless an exception to the warrant requirement applies. . . .

"Pursuant to the principles of *Katz*, therefore, we do not rest our analysis exclusively upon such abstractions as 'trespass' or 'constitutionally protected areas' or upon the physical differences between a telephone booth and the land surrounding a residence; we do, however, look to the conduct of people in regard to these elements. Taking into account the nature of the area surrounding a private residence, we ask whether that area has been opened to public use; if so, the occupant cannot claim he expected privacy from all observations of the officer who stands upon that ground; if not, the occupant does deserve that privacy. Since the eavesdropping officer in the case before us stood upon private property and since such property exhibited no invitation to public use, we find that the officer violated petitioner['s] . . . expectations of privacy. . . ."

Merely because a householder may expect friends, neighbors or other civilian members of the public to enter upon the grounds surrounding his residence does not imply his consent to the police so entering (*Jacobs v. Superior Court* (1973) 36 Cal.App.3d 489, 494, fn. 2 [111 Cal.Rptr. 449]; *People v. Sneed* (1973) 32 Cal.App.3d 535, 541-542 [108 Cal.Rptr. 146]). The same expectations of privacy apply to Ramos' entry through the gate into the backyard (*Vidaurri v. Superior Court* (1970) 13 Cal.App.3d 550 [91 Cal.Rptr. 704]; see also *People v. Edwards, supra*, 71 Cal.2d, p. 1104) and his subsequent entry into the garage (*People v. Medina* (1972) 7 Cal.3d 30, 40 [101 Cal.Rptr. 521, 496 P.2d 433]; *People v. Bruce* (1975) 49 Cal.App.3d 580, 585 [122 Cal.Rptr. 648]; *People v. Hobbs* (1969) 274 Cal.App.2d 402, 405 [79 Cal.Rptr. 281]).

Thus, since the physical setting reasonably entitled defendant to expect privacy within her home and its immediate surroundings, and Ramos' conduct unreasonably infringed that privacy, his conduct constituted an unreasonable search in violation of the federal and California Constitutions. However, the record indicates that no real evidence was gathered from these initial searches by Ramos. Rather, two significant observations (the dog feces on the floor and the presence of the Cadillac in the garage) became part of the "totality of circumstances" later used to justify his forcible entry through the bedroom window.

As Ramos' initial searches and his subsequent entry were made without a warrant, the burden was on the prosecution to show justification for the search (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23]).

■ ■■■ Defendant contends that the proper standard is not simply whether Ramos' conduct might have been reasonable under all of the circumstances, as the court below found, but whether the People have shown that his entry into the Ammons home falls within one of the specifically established and well delineated exceptions to the warrant requirements.[2]

Among these exceptions is the emergency doctrine (*Vale* v. *Louisiana* (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; *People* v. *Smith* (1972) 7 Cal.3d 282, 286 [101 Cal.Rptr. 893, 496 P.2d 1261]). ■ Both state and federal courts follow the rule that exigent circumstances may justify a warrantless search which might otherwise have been unreasonable and thus illegal (*People* v. *Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721]; *People* v. *Bradford* (1972) 28 Cal. App.3d 695, 703 [104 Cal.Rptr. 852]; *People* v. *Baird* (1971) 18 Cal. App.3d 450, 454 [95 Cal.Rptr. 700]; see also *United States* v. *Goldenstein* (8th Cir. 1972) 456 F.2d 1006; Roberts, *The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment* (1975) 43 Fordham L.Rev. 571; Fortier, *The Police As Good Samaritan: Constitutional Dimensions of the Emergency Exception to the Search and Seizure Doctrine* (1974) 3 Police L.Q. 22 (Spring) and 37 (Sum-

---

[2]It is well settled, unless within one of the carefully circumscribed exceptions, a warrantless search is per se unreasonable (*Mincey* v. *Arizona* (1978) 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408]; *People* v. *Cook* (1978) 22 Cal.3d 67, 97 [148 Cal.Rptr. 605, 583 P.2d 130]).

mer); Mascolo, *The Emergency Doctrine Exception To The Warrant Requirement Under The Fourth Amendment* (1973) 22 Buffalo L.Rev. 419).

The "emergency exception" to the warrant requirement was first recognized in *People* v. *Roberts, supra,* 47 Cal.2d 377, where our Supreme Court stated that "Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose." In *Roberts, supra,* the circumstances justifying entry were knowledge that a sick person resided in an apartment and the moans overheard by the officers. In *People* v. *Clark* (1968) 262 Cal.App.2d 471 [68 Cal.Rptr. 713], the neighbors had heard a woman scream for help on the street and believed she had been forced into an apartment.

In *People* v. *Gallegos* (1970) 13 Cal.App.3d 239 [91 Cal.Rptr. 517], officers received a telephone call from an anonymous person who advised them that the defendant had taken an overdose of heroin. As the officers knew that the defendant was a user, an officer proceeded to the address given. When a small child answered the door and indicated that the defendant could not be awakened, the officer entered without permission and found narcotics. In upholding the entry under the emergency exception, the appellate court noted that it was bound by the trial court's finding that the officer had a sincere belief that the defendant was in mortal danger from the overdose. The court noted at page 243: "We appreciate that there is always the possibility that the police may try to hide an illegal entry under the cover of a pretended rescue mission. Here, as always, we must rely on the ability of trial courts to ferret out the true facts."

In *People* v. *Parra* (1973) 30 Cal.App.3d 729 [106 Cal.Rptr. 531], a police officer responded to a citizen's report that a florist shop was unlocked after business hours. There were no lights inside the shop and no way of ascertaining the identity of the owner. The officer entered the shop with the intention of finding out who the owner was and notifying him of the situation. In the course of his investigation, the officer found heroin and the owner of the shop was convicted on a plea of guilty to possession of heroin after denial of his motions to suppress the heroin. In affirming, the appellate court held that the police officer's entry into the shop was for the purpose of protecting the shop and its contents and, therefore, proper.

In *People* v. *Smith, supra,* 7 Cal.3d 282, an order suppressing evidence found in the defendant's apartment was affirmed. The People attempted to justify the entry on the basis that a six-year-old child had been locked out. There was no peril to the child, however, since she was being taken care of by the landlord and by the police. The possibility that her mother was in difficulty in the apartment was belied by the girl's statement that she was not at home and by the lack of any evidence indicating she had returned. The Supreme Court stated the limits of the rule of necessity as follows, at pages 285-286: "The solicitude of the police for the girl's safety and welfare was of course commendable. But the police must also be concerned with the interest of her parent in the security and privacy of her home, an interest expressly protected by constitutional command. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 19.) The issue, therefore, is not simply whether the conduct of Officer Brown might have been 'reasonable' under all the circumstances, but whether the People have shown that his entry into Mrs. Blinn's home falls within one of the 'few specifically established and well-delineated exceptions' to the warrant requirement. [Citations.] Among those exceptions is the emergency doctrine. (*Vale* v. *Louisiana, supra,* [1970] 399 U.S. at p. 35 [26 L.Ed.2d at p. 414 (90 S.Ct. 1969)].) But the exception must not be permitted to swallow the rule: in the absence of a showing of true necessity—that is, an imminent and substantial threat to life, health, or property—the constitutionally guaranteed right to privacy must prevail."

More recently, the doctrine of necessity and the reasoning of *Roberts, supra,* 47 Cal.2d 374, were held to sustain entries after the facts indicated that young children or infants had been left unattended (*In re Dawn O.* (1976) 58 Cal.App.3d 160 [128 Cal.Rptr. 852]; *People* v. *Sutton* (1976) 65 Cal.App.3d 341 [134 Cal.Rptr. 921]). Neither *Dawn O.* nor *Sutton* involved a search.

In view of the facts known by Ramos in the instant case, we think that the emergency doctrine is clearly applicable and the consequent search reasonable. It is uncontroverted that Ramos entered without an accompanying intent to arrest or search and on the basis of his "strong feeling" that something was amiss. A police officer with many years of experience acquires a certain feel for people and situations. He should not be precluded from relying on this experience where, as here, there is a wholly benevolent motive, and a rational basis for believing that circumstances tantamount to an emergency are present. Here, Ramos had such a rational basis. Both cars were home; de-

fendant was usually home on Monday morning; the dog was left unattended long enough to defecate on the floor. Usually a neighbor cared for the dog when the Ammons were away. Contrary to their custom, the Ammons had not told this neighbor that they would be away from home. The victim, normally a punctual employee, was several hours late for work and had not called; his employer expressed concern for his welfare. Defendant had a heart condition for which she was under a doctor's care and was taking medication. The Ammons neighbors had not seen them for two days. Their daughter was on vacation and could not be reached. Ramos' only motive for entering the Ammons residence was to render aid or assistance.

"The right of police *to enter and investigate in an emergency without the accompanying* intent to either search or arrest is inherent in the very nature of their duties as peace officers, and derives from the common law" (*United States* v. *Barone* (2d Cir. 1964) 330 F.2d 543, 545, cert. den. 377 U.S. 1004 [12 L.Ed.2d 1053, 84 S.Ct. 1940] (italics added). Conduct of this kind should be encouraged and commended. In balancing the interests at stake in the case of the truly benevolent civil search, the preservation of human life is paramount to the right of privacy protected by the constitutional guarantees (cf. *Patrick* v. *State* (Del. 1967) 227 A.2d 486, 489). We conclude that Ramos' entry was proper.

The body of the victim, the defendant and the murder weapon were in plain sight. Further, the presence of the body provided probable cause to believe that a felony had been committed. At this point, Ramos was no longer restricted by the Fourth Amendment to merely rendering aid. Thus, all of the evidence admitted at the trial was properly seized (cf. *People* v. *Amaya* (1979) 93 Cal.App.3d 424, 428 [155 Cal.Rptr. 783]; see also, *People* v. *Hill* (1974) 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1]; *People* v. *Smith* (1966) 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Gilbert* (1965) 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Carter* (1972) 26 Cal. App.3d 862 [103 Cal.Rptr. 327]).

As we have concluded that the entry, searches and seizures were lawful, we need not discuss defendant's contention pertaining to the trial court's application of the inevitable discovery rule.

Defendant's contention that her confession to Dr. Sward was the product of being confronted with evidence illegally obtained, namely,

the fact that she was still alive, borders on the frivolous. As we have indicated that none of the searches were unlawful, defendant was not confronted with any illegally obtained evidence. Further, the uncontroverted evidence indicated that Dr. Sward was present as defendant's long-time family physician. He was not required to advise her of her rights (*In re Eric J.* (1979) 25 Cal.3d 522 [159 Cal.Rptr. 317, 601 P.2d 549]; *People* v. *Mangiefico* (1972) 25 Cal.App.3d 1041, 1049 [102 Cal.Rptr. 449]).

 In the absence of any evidence of complicity on the part of law enforcement officials, the admissions or statements made by a defendant to a private citizen infringe no constitutional guarantees (*People* v. *Mangiefico, supra*; *People* v. *Price* (1965) 63 Cal.2d 370, 379 [46 Cal.Rptr. 775, 406 P.2d 55]; *People* v. *Polk* (1965) 63 Cal.2d 443, 449 [47 Cal.Rptr. 1, 406 P.2d 641]; see also *People* v. *Montgomery* (1965) 235 Cal.App.2d 582, 590 [45 Cal.Rptr. 475]). It follows that defendant's confession was properly admitted.

Likewise, the warrant based on Ramos' observations on July 11 and defendant's confession was properly issued and no unlawful search occurred as a result of the execution of that warrant.

Finally, defendant contends that she was deprived of due process because the Napa County authorities failed to preserve the tape recordings that were made of all communications between Ramos and the police dispatcher on July 11. She asserts that the intentional destruction of these tapes concealed material evidence in her favor.

The record indicates that all communications between Ramos and the police dispatcher on July 11 were recorded by monitoring tape recorders of the Napa police and Napa County sheriff. These tapes were erased within a matter of hours by the Napa police and after approximately one month by the Napa County sheriff. Thus, they were not available for discovery by defendant. The record also indicates that the police and sheriff routinely reuse their tapes; thus, every 30 days, the sheriff's office's tapes are automatically destroyed by reusal and, within 6 hours, the same is true of the police tapes.

 Law enforcement officers are under a duty to preserve material evidence; its intentional suppression may constitute a violation of due process irrespective of the authorities' good or bad faith; where, as here, evidence has been destroyed, the court has no independent means of de-

ciding whether it could have been material; at this point, the court's disposition depends upon the good or bad faith attending the suppression or destruction; if the authorities acted in good faith, the defense will be called upon to make a showing of substantial materiality (*People v. Hitch* (1974) 12 Cal.3d 641, 645, 649-653 [117 Cal.Rptr. 9, 527 P.2d 361]; *People v. Ruthford* (1975) 14 Cal.3d 399, 409 [121 Cal.Rptr. 261, 534 P.2d 1341]; *People v. Wright* (1976) 60 Cal.App.3d 6, 15-16 [131 Cal.Rptr. 311]).

Here, the court below properly found that the tapes were only significant to establish Ramos' justification for entering the Ammons home. At most, they could be used only to impeach his testimony. Thus, defendant has not met her burden of showing that the tapes contained substantial material evidence. Further, all the parties involved in those conversations testified in court under both direct and cross-examination. Any inconsistencies in the testimony were known and weighed by the court.

The judgment is affirmed.

Rouse, J., and Miller, J., concurred.

A petition for a rehearing was denied April 3, 1980.