490 A.2d 763

**Raymond J. HAMILTON**

v.

**STATE of Maryland.**

No. 1118, Sept. Term, 1984.

Court of Special Appeals of Maryland.

April 12, 1985.

604

Michael R. Braudes, Asst. Public Defender and Nancy Forster, Assigned Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Nicolette H. Prevost, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, and J. Donald Braden, State's Atty. for Queen Anne's County of Centreville, on brief), for appellee.

Argued before BISHOP, ALPERT and ROSALYN B. BELL, JJ.

ALPERT, Judge.

Raymond Hamilton, appellant herein, feels aggrieved by the methods employed by the Maryland State Police in investigating the murder of one Frank Siejack. He contends, in this appeal, that the police violated his constitutional rights by taping conversations between himself and

his acquaintances who, at the time, were acting as State agents. Upon a review of the record and applicable case law we, as the court below, find no such violation. We explain.

Appellant's convictions [1] in the case *sub judice* are in connection with the shooting of Frank Siejack in Queen Anne's County, Maryland, on August 8, 1978. Prior to trial, appellant filed a Motion to suppress several statements made by him during the course of the Maryland State Police Department's murder investigation. The statements were made by appellant to appellant's acquaintances who, at the behest of the State police, agreed to tape their conversations with appellant in exchange for the authorities' consideration on pending charges.

James Letchworth's conversations with appellant were taped when Letchworth consented to wearing a body wire which would allow the police to monitor and record their conversations. The tapes which appellant sought to suppress were made prior to any charges being brought against appellant and concern, generally, the events surrounding Siejack's murder.

The tapes of appellant's conversations with Kenneth Fowler were also made while Fowler was wearing a body wire. These conversations occurred prior to appellant's being charged in this case but after appellant had been incarcerated in connection with an unrelated matter. On two occasions Fowler visited appellant at the Maryland House of Correction and elicited from appellant incriminating statements regarding Siejack's murder. The last tape, one of a conversation between Fowler and appellant, was made on July 14, 1982, and occurred after the police had surreptitiously arranged for appellant's release from prison.

---

1. Appellant was found guilty of first degree murder (Count 1); assault with intent to murder (Count 2); assault and battery (Count 3); assault (Count 4); and using a handgun in the commission of a crime of violence (Count 5). Counts 2 and 4 were merged with Count 1 for sentencing purposes. No sentence was given as to Count 3 under a rule of lenity.

The conversation which concerns the murder weapon took place as Fowler and appellant drove to the crime scene.

The trial court denied appellant's motion to suppress his statements to both Fowler and Letchworth. Before us appellant challenges only the admissibility of his statements to Kenneth Fowler. Appellant asserts that the statements made while he was in the Maryland House of Correction were the result of "custodial interrogation" and, therefore, were inadmissible because they were not preceded by *Miranda* warnings. He also argues that the statements made at the crime scene concerning the murder weapon were inadmissible as the fruit of a poisonous tree.

## I.

■ Preliminarily, we observe that the admission of these tapes does not appear to be in violation of the Maryland or federal wire tap statutes. Section 10–402(c)(2) of the Courts and Judicial Proceedings Article permits the interception of oral communication in order to provide evidence of the commission of the offense of murder if "one of the parties to the communication has given prior consent to the interception." Md.Cts. & Jud.Proc.Code Ann. § 10–402(c)(2) (1984 Repl.Vol.); 18 U.S.C. § 2511(2)(c) (1982). *See also* Gilbert, *A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law,* 8 U.Balt.L.Rev. 183, 193 (1979).

■ Next, we observe that the admission of these tapes is not in violation of appellant's Fourth Amendment protections against unreasonable searches and seizures. The Supreme Court in *United States v. White,* 401 U.S. 745, 747, 91 S.Ct. 1122, 1123, 28 L.Ed.2d 453 (1971) indicated that in a similar situation there was no "justifiable expectation of privacy" because:

> [T]he law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent ... [or] when that same agent has recorded or transmitted the

conversations which are later offered in evidence to prove the State's case.

*Id.* at 752, 91 S.Ct. at 1126.

Appellant's argument before us is essentially that admission of the statements made to Fowler was in violation of his Fifth Amendment privilege against self-incrimination. Specifically, he argues that Fowler's conversations with him were custodial interrogations and, therefore, should have been preceded by advising him of his *Miranda* rights. We disagree.

■■■ The Supreme Court's decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) requiring that certain advisory rights be read to an accused prior to questioning was predicated upon its conclusion "that without proper safeguards the process of *in-custody* interrogation of persons suspected or accused of crime contains *inherently compelling* pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely...." 384 U.S. at 467, 86 S.Ct. at 1624 (emphasis added). *See also Hoffa v. United States,* 385 U.S. 293, 304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). While advising an accused of his rights is merely a procedural safeguard, *see Miranda,* 384 U.S. at 478, 86 S.Ct. at 1629, it, nonetheless, aids in "mitigating the dangers of [the] untrustworthiness" of the accused's statements. *Id.* at 470, 86 S.Ct. at 1625. *Miranda* warnings must be given when "an individual is taken into *custody* or *otherwise deprived of his freedom* by the authorities in any significant way and is subjected to *questioning." Id.* at 478, 86 S.Ct. at 1629 (emphasis added). In order, therefore, to find a violation of *Miranda* in the case *sub judice,* we must find (a) that appellant was interrogated; (b) that the interrogation occurred while he was in custody or otherwise deprived of his freedom; and (c) that appellant was not properly advised of his *Miranda* rights.

■■ Appellant argues and we agree that Fowler's conversations with him amounted to an interrogation because

Fowler was a "state agent sent for the purpose of questioning [him] about the Siejack case...."

Where an accused's statements are elicited by persons other than police, official interrogation has been held to exist where the State is otherwise involved. In *Marrs v. State*, 53 Md.App. 230, 452 A.2d 992 (1982) we held that statements made to a probation officer without the benefit of *Miranda* warnings were inadmissible in a subsequent criminal prosecution. *Compare, Minnesota v. Murphy,* —— U.S. ——, 104 S.Ct. 1136, 1143 n. 5, 79 L.Ed.2d 409 (1984). While only "official" custodial interrogation is proscribed by the Fifth Amendment and must be preceded by *Miranda* warnings, we observed in *Marrs* that the protection of the Fifth Amendment was not "limited to any single source of official interrogation." *Id.,* 53 Md.App. at 233, 452 A.2d 992. Questioning by prison guards, I.R.S. agents, court designated psychiatrists and prosecuting attorneys have all been held to amount to official interrogation. *See Marrs,* 53 Md.App. at 233, 452 A.2d 992 and cases cited therein.

In cases where courts have addressed the admissibility of incriminating statements elicited from an accused by an informant, they have been held admissible because there was no evidence of the government's involvement in the questioning. For example, in *People v. Ammons,* 103 Cal. App.3d 20, 162 Cal.Rptr. 772 (1980) the court held admissible statements made by an accused to her family doctor. The court noted that "[i]n the absence of any complicity on the part of law enforcement officers, the admissions or statements made by a defendant to a private citizen infringe no constitutional guarantees." *Id.* at 32, 162 Cal.Rptr. 772. Also, in *In Re Eric J.,* 25 Cal.3d 522, 159 Cal.Rptr. 317, 601 P.2d 549 (Cal.1980) the court held that a juvenile's confession to a private citizen was admissible even though it occurred in the presence of a police officer. The court found, *inter alia,* that the private citizen who interviewed the accused did so on his own initiative and without the participation or direction of the police officer who was present at the time. *See also People v. Mangiefico,* 25

Cal.App.3d 1041, 1049, 102 Cal.Rptr. 449 (1972) ("In the instant case, as already discussed, there is no evidence that [the informant] was acting as an agent of local enforcement officials."). *Cf. United States v. Burton,* 724 F.2d 1283 (7th Cir.1984) (statements made by the accused were not the result of questions asked by an informant).

Unlike the above cases, however, in the case *sub judice* the informant's conversations with appellant were in fact solicited by and at the direction of the State police. At the suppression hearing, as part of a stipulation, it was admitted that the State police solicited Fowler's aid in its investigation. At trial, Trooper Newcomer of the Maryland State Police testified that he and other officers gave Fowler the questions and information they wanted to elicit from appellant prior to his conversations with appellant. Fowler was asked to "solicit conversations from [appellant] in regards to the Siejack shooting." This difference is material. In the case *sub judice* the State was directly involved in soliciting statements from the accused.

■ Having established interrogation, appellant asseverates that the interrogation was violative of his Fifth Amendment rights because "interrogation of an inmate in a penal institution constitutes a *custodial* situation." (emphasis added). We disagree.

The custody referred to in *Miranda* is that form of custody which exists at the time of the questioning. Only if the accused is in a situation where there are inherently compelling pressures to respond to the interrogation are *Miranda* warnings required.

In *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) a government informer, a business associate of Hoffa's, testified at Hoffa's trial regarding statements Hoffa made in his presence about attempts to tamper with a jury. The statements were made by Hoffa at his hotel suite. The trial court, in admitting the testimony, found that the associate's contact with police was of his own initiative and that when contacted the government

requested only that the associate report information of which he became aware. In addressing Hoffa's claimed violation of his Fifth Amendment rights, the Court stated:

> There have been sharply differing views within the Court as to the ultimate reach of the Fifth Amendment right against compulsory self-incrimination. Some of those differences were aired last Term in *Miranda v. Arizona*, 384 U.S. 436, 499, 504 526 [86 S.Ct. 1602, 1640, 1643, 1654, 16 L.Ed.2d 694]. But since at least as long ago as 1807, when Chief Justice Marshall first gave attention to the matter in the trial of Aaron Burr, all have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion.... In the present case no claim has been or could be made that the petitioner's incriminating statements were the product of any sort of coercion, legal or factual. The petitioner's conversations with Partin and in Partin's presence were wholly voluntary. For that reason, if for no other, it is clear that no right protected by the Fifth Amendment privilege against compulsory self-incrimination was violated in this case.

*Id.* at 303–04, 87 S.Ct. at 414–15 (footnote omitted). *See also Pulley v. State*, 43 Md.App. 89, 98, 403 A.2d 1272 (1979).

The seminal case in custodial interrogation violative of the Fifth Amendment came two years later in *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). In *Mathis*, the Supreme Court held inadmissible a prisoner's statements to Internal Revenue Service agents. The statements were made when the prisoner was questioned by the agents about his tax returns; he was, at the time, incarcerated on an unrelated matter. No *Miranda* warnings were given the prisoner and the statements were later used in the prisoner's subsequent trial for filing false returns. The Court, in reversing, noted:

> The Government here seeks to escape application of the *Miranda* warnings on two arguments: (1) that these questions were asked as a part of a routine tax investiga-

tion where no criminal proceedings might even be brought; and (2) that the petitioner had not been put in jail by the officers questioning him, but was there for an entirely separate offense. These differences are too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody.

*Id.* at 4, 88 S.Ct. at 1504–05.

Later, in *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), however, the Supreme Court, while holding that statements made to a police informant after indictment of the accused *and while the accused was incarcerated* were inadmissible on Sixth Amendment grounds, addressed Fifth Amendment concerns in *dicta*. Citing *Hoffa* for authority, the Court noted that "the Fifth Amendment had not been held to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion." *Id.* at 272, 100 S.Ct. at 2187 (emphasis added).

Appellant relies upon two decisions of this court for support, *Hunt v. State*, 2 Md.App. 443, 243 A.2d 785 (1967) and *Leuschner v. State*, 41 Md.App. 423, 397 A.2d 622, *cert. denied*, 285 Md. 731, *cert. denied*, 444 U.S. 933, 100 S.Ct. 693, 62 L.Ed.2d 662 (1979).

In *Hunt* we held that statements elicited from an accused while the accused was incarcerated were inadmissible against him at trial. The statement was given while being questioned by a State police sergeant in an assistant warden's office; it was held, without discussion, to be a custodial interrogation.

Later in *Leuschner* we held that statements made to an undercover police officer by an incarcerated accused were admissible because "his statements were not made in response to interrogation." 41 Md.App. at 433, 397 A.2d 662. The trial court found and we did not dispute that

[t]he trooper ... did not initiate conversation relative to the crime in question. His testimony was that he con-

ducted no interrogation, no questioning about the crimes about which he was attempting to find information, and in fact the only information that he was able to elicit was that the defendant knew where the bodies were buried. *Id.* at 434, 397 A.2d 662. While it is clear that the decision rested upon the lack of interrogation, we reached that issue only after summarily concluding that "there [was] no doubt [appellant] was in custody." *Id.* at 433, 397 A.2d 662.

The most recent Court of Appeals decision in the area, however, indicates that we may have been wrong in automatically equating imprisonment with "in custody." The Court, while noting that a few courts had relied on *Mathis v. United States*, to equate prison confinement with custody, found it unnecessary to do so in *Whitfield v. State*, 287 Md. 124, 411 A.2d 415 (1980).

In *Whitfield* an inmate was interrogated by prison officials in connection with the presence of a handgun in the prison. Despite the absence of *Miranda* warnings, the trial court admitted the statements made to the prison officials and we affirmed, based upon an emergency exception to *Miranda*.[1] *See Whitfield v. State*, 42 Md.App. 107, 400 A.2d 772 (1979). The Court of Appeals, in reversing, found no emergency exception to *Miranda* and then analyzed whether the interrogation was custodial within the meaning of *Miranda*. The Court noted that there were a variety of tests used to determine custody but applied the "objective reasonable person approach to determining custody." 287 Md. at 140, 411 A.2d 415. Under the reasonable person test

custody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority. * * * [T]he custody requirement of *Mi-*

---

**1.** Similarly, the Supreme Court of the United States in *New York v. Quarles*, — U.S. ——, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), recently recognized a "public safety" exception to *Miranda*. Therefore, the Court of Appeals' holding in *Whitfield* appears to have been implicitly overruled.

*randa* does not depend on the subjective intent of the law enforcement officer-interrogator but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. . . .

*Id.* (quoting *Myers v. State,* 3 Md.App. 534, 537, 240 A.2d 288 (1968)). In making this evaluation, the court must consider

those facts intrinsic to the interrogation; when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Id.,* 287 Md. at 141, 411 A.2d 415 (quoting *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979)). In *Whitfield* the Court found the interrogation to be custodial.

Unlike *Whitfield,* applying these factors in the instant case it is clear that despite appellant's incarceration the interrogation was not custodial. The conversations with Fowler were carried on out of the presence of the police. Additionally, appellant spoke with Fowler of his own volition, was not required to stay and continue the conversation and could have left Fowler at any time. While appellant may have been incarcerated, there is nothing in the record which would indicate to a reasonable person that appellant was not free to discontinue the conversations with Fowler.

Hence, because, under the circumstances, the restrictions on appellant's freedom, as he conversed with Fowler, were insufficient to render him "in custody" under *Miranda,* no *Miranda* warnings were required. *See also Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). We must not forget that *"Miranda . . . was aimed not at self-incrimination generally . . . but at compelled self-incrimination*—the inherent coercion of the custodial, incommunicado, third-degree questioning process." *Cummings v. State,* 27 Md.App. 361, 364, 341 A.2d 294, *cert. denied,* 276 Md. 740 (1975). In other words, "[t]he purpose of *Miranda* was to ventilate the musty and at times mysterious precincts of the interrogation room by opening the door to a lawyer or at least apprising the suspect fully of his legal rights in that regard." R. Gilbert and C. Moylan, *Maryland Criminal Law: Practice and Procedure,* § 39.5 (1983). The *Miranda* Court, in deeming custodial interrogation as "inherently coercive," decried that "such an interrogation *environment* is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation." *Miranda,* 384 U.S. at 457, 86 S.Ct. at 1618 (emphasis added).

Thus, we can see that it is the interrelationship of the examiner and the environment that creates the coercive *atmosphere*—that determines custody *vel non.* Although the environment here, a prison, leads us to thoughts of custody, there is nothing coercive whatsoever in the casual questioning by the informer Fowler (appellant's acquaintance or accomplice) who ostensibly was not a police interrogator, that would functionally or effectively subjugate appellant to Fowler's will. Accordingly, the trial court committed no error in admitting these statements.

█ Appellant also challenges the admissibility of the statements he made to Fowler on July 14, 1982, while they were driving to the crime scene. Appellant does not allege that this statement was the result of a custodial interrogation. He does argue, however, that they ought to have

been excluded as "fruits of the poisonous tree." Appellant, in this instance, incorrectly presumes that the conversations which occurred in prison were illegal, which they were not. Consequently, these statements, too, were admissible. *See United States v. White,* 401 U.S. 745, 747, 91 S.Ct. 1122, 1123, 28 L.Ed.2d 453 (1971).

## II.

Next, appellant contends that the trial court committed reversible error by refusing to instruct the jury that the supplier of a gun in a murder case could be guilty of felony murder. Appellant apparently requested the instruction because Fowler admitted to having supplied the murder weapon and argues now that "the precise extent of liability he avoided through his testimony against appellant was obviously relevant to his credibility."

■ The State, relying upon *vonLusch v. State,* 279 Md. 255, 368 A.2d 468 (1979) argues that appellant has waived any error on this issue because, at trial, counsel stated specific grounds for the exception and now raises new grounds. Upon a review of the record, however, it appears to us that the State is incorrect. At trial defense counsel excepted to the court's instructions and indicated that the court should have instructed the jury that an accessory before the fact could be guilty of murder. When asked how the instruction would affect his client, appellant's counsel remarked that he was addressing the court's instruction and not, apparently, its affect upon his client. Contrary to the State's argument, we do not believe that this constitutes a statement of grounds for exception. We will, therefore, address appellant's contention.

■ A trial judge is required to give a requested instruction if it correctly states the applicable law and has not been covered in instructions actually given. *Landsdowne v. State,* 287 Md. 232, 412 A.2d 88 (1980). *See also* Maryland Rule 757(b). In the case *sub judice* the requested instruction was a correct statement of the law. *See State v.*

*Ward,* 284 Md. 189, 396 A.2d 1041 (1978). The issue, however, was fairly covered in the instructions actually given. The Court stated:

> I would further tell you that an *accomplice, that is, a person who participates in the commission of a crime, either present during the commission of a crime, or who in any way aids or abets or assists in the perpetration of a crime beforehand,* or even after the commission of a crime, is an accomplice. And an accomplice is competent as a witness for the State in the trial of a criminal case. An accomplice is one who knowingly, voluntarily, and with common criminal intent with the principal offender unites with him in the commission of a crime, whether as a principal—and I defined a principal as one who is present when there is commission of a felony, a person who is present during the commission of a crime—or as an accessory before the fact. And that, I have previously described, is one who before the actual commission of the crime in some way instigates it or encourages it, assists or makes it possible for the crime to be committed, can be an accessory before the fact. Thus the testimony of an accomplice is to be evaluated by you with great caution and scrutinized with care. Now I instruct you further that an informer, whether or not they might be an accomplice, is a competent witness, and the use of informers is a recognized means of law enforcement. However, the testimony of an informer who provides evidence against the defendant in a criminal case for pay, for immunity from prosecution or punishment, or for personal advantage or vindication, must be examined and weighed by you with greater care than the testimony of an ordinary witness. You must determine whether the informer's testimony has been affected either by interest or prejudice against the Defendant. You should receive such testimony with suspicion and act upon it with caution.

A killing by one accomplice, even if it's unintentional, which is in furtherance of or pursuant to the common object or purpose for which they combined, extends criminal liability for murder in the first degree under this law to each and every accomplice who was present during the commission of that crime.

(emphasis added).

Additionally, we note that the jury was already aware of Fowler's interest in testifying, including the favorable disposition of a homicide charge by virtue of Fowler's own testimony. Fowler testified that in exchange for his cooperation, Trooper Newcomer agreed to get Fowler released from federal prison, where he was serving time on an unrelated matter, and to get other charges against him, including a homicide charge, dropped or suspended.

■ Consequently, in light of the fact that the instruction given adequately covered the instruction requested and in light of the jury's awareness that Fowler possibly avoided a murder charge by cooperating, there was no error in refusing to give the requested instruction.

### III.

■ Finally, appellant argues, the State concedes and we agree that his sentence of 20 years in connection with Count 5, the handgun conviction arising from the murder, was illegal because at the time the murder was committed the maximum sentence was 15 years. *See* Md.Code Ann. art. 27, § 36B(d) (1983 Repl.Vol.). Accordingly, we vacate the sentence on Count 5 and remand to the Circuit Court for Kent County for resentencing on appellant's handgun conviction.

JUDGMENT ON COUNT 1 AFFIRMED; CONVICTION ON COUNT 5 AFFIRMED, SENTENCE VACATED, CASE REMANDED FOR RESENTENCING ON THAT COUNT; QUEEN ANNE'S COUNTY TO PAY ⅓ COSTS; APPELLANT TO PAY ⅔ COSTS.