[Crim. No. 4419. Fifth Dist. July 20, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
RUBEN GARNICA, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Richard G. Fathy and Eric J. Coffill, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Robert D. Marshall and Vincent J. Scally, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FRANSON, Acting P. J.**—Appellant stands convicted after a jury trial of first degree murder; he was sentenced to life imprisonment. On appeal he contends the following errors compel reversal of his conviction: (1) the trial court should have suppressed the prosecution testimony of Marla Klemmer under *People v. Hitch* (1974) 12 Cal.3d 641 [117 Cal. Rptr. 9, 527 P.2d 361] because the police failed to preserve a tape recording of the first interview with Ms. Klemmer; (2) the court erred by admitting evidence of an uncharged offense—attempted murder—under the rationale that the evidence was admissible to show a common plan or design; and (3) the prosecutor committed *Griffin*[1] error during argument to the jury.

As we shall explain, none of these contentions have merit. Appellant, however, is entitled to good-time/work-time credits for presentence custody.

### THE EVIDENCE

In 1977 appellant was a lieutenant in the Nuestra Familia, a prison gang which was originally organized to provide security to Mexican-American prisoners but which expanded into various forms of criminal activity outside prison.

Appellant's affiliation with Nuestra Familia and high rank in that organization were confirmed by Art Beltran, a former member of the family who had at one time occupied the number three position in the entire organization.[2] Beltran gave the following testimony about Nuestra Familia. It is organized along military lines and its soldiers are

---

[1]*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].

[2]Beltran testified about the Nuestra Familia organization and its members in numerous trials in various California counties as part of a deal he made with law enforcement.

promoted to higher rank on the basis of their service to the organization. Beltran said the Nuestra Familia maintained several "hit lists" containing names of the individuals considered enemies. Some of the groups considered inimical to the Nuestra Familia are the Mexican Mafia, the Aryan Brotherhood and the United White People's Party. Every lieutenant in Nuestra Familia was responsible for "see[ing] to it that something was done about the people on the list." The higher-ups schooled their subordinates as to the identity of the gang's enemies and a lieutenant could, on his own initiative, order his soldiers to execute a known enemy of the Nuestra Familia.

Guadalupe Ramirez testified he was a member of Nuestra Familia and appellant was his superior in that organization. In March 1977, Ramirez and appellant were together in a store when a minor confrontation occurred with a man named Robert Fuller. Fuller gave appellant and Ramirez some "hard looks." Ramirez and appellant suspected that Fuller was a member of one of their rival gangs—the Aryan Brotherhood; appellant said he would check on it. The next thing Ramirez heard on this subject was when appellant told him to go find Fuller and to kill him. Appellant provided Ramirez with a revolver and an assistant, Carlos Gonzalez. Ramirez and Gonzalez went looking for Fuller; when they found him at about 9 p.m. on the evening of March 24, 1977, Ramirez shot Fuller to death. Ramirez then reported to appellant what he had accomplished and the two men watched the T.V. news to learn that Fuller was indeed dead.

Marla Klemmer testified that she had worked for appellant selling heroin and collecting money from prostitutes. She was also Ramirez' girl friend. She was with appellant and Ramirez when the minor confrontation with Fuller occurred in the store. After that confrontation, appellant's group returned to appellant's house. Ms. Klemmer overheard appellant tell Ramirez that Fuller was an Aryan Brother and that Ramirez was going to have to "hit" him. Later Ms. Klemmer heard appellant congratulate Ramirez on the good job he had done.

Evidence of an uncharged criminal offense was admitted over a defense objection based on Evidence Code section 352.[3] Guadalupe Ramirez testified that about a week before appellant ordered him to kill

---

[3]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Fuller, appellant had also commanded him to kill another enemy of Nuestra Familia, one Reggie Garcia, a woman who had testified against a member of Nuestra Familia. When Ramirez went to carry out this order he was accompanied by appellant and two other men. They had some difficulty locating Reggie, but eventually saw her with a man—apparently her brother. Ramirez took off after the brother, but appellant directed Ramirez to get "the girl." Appellant stood back and watched while Ramirez joined the other men who were stabbing the girl. When the assailants left, Ramirez thought Reggie was dead, but he later learned that she had survived the attack.

The trial judge admitted the above evidence under the theory that it was relevant to show a conspiracy, in which appellant and Ramirez were involved, and which was aimed at achieving the Nuestra Familia's program—elimination of its enemies. The court recognized that this evidence was "obviously prejudicial" but stated that the probative value outweighed the prejudice because the evidence related to the central issue of the case.

## No Hitch Error

■ Appellant first contends that under *People* v. *Hitch, supra*, 12 Cal.3d 641, the trial court was required to suppress the testimony of Marla Klemmer because the defense was unable to effectively impeach Ms. Klemmer inasmuch as the tape recording of her police interview on October 24, 1977, had been lost by law enforcement agencies prior to trial.[4] A 25-page transcript of the tape recording, however, was preserved and made available to the defense. Defense counsel argued that the transcript was inadequate because it contained over 100 blanks where words were omitted; the blanks were shown by dashes in the transcript. Defense counsel stated that he suspected the deletions were intentional although he gave no reasons for his suspicion.

The trial judge carefully read the transcript of the Klemmer interview and made the following findings: (1) there was no indication of any deliberate deletion of material from the interview; (2) what appeared to be missing words "[read] as if" certain words were merely unintelligible; (3) for the most part, the missing words did not destroy the continuity of the interview; and (4) the transcript read in many instances as if the blanks signified merely a pause in the conversation.

---

[4]The explanation was that various law enforcement agencies had borrowed the tape from time to time and one of the times it was borrowed "it just wasn't returned."

The trial judge then noted that Klemmer was present at the trial to testify; the two officers who conducted the interview were also present; and the person who typed the transcript could be located and brought to court to be examined as to the reason for the blanks in the transcript. The trial court concluded that appellant's right to a fair trial had not been compromised. The "bottom line . . . is that [the defendant has made] no showing of the . . . loss of any favorable evidence to impeach Ms. Klemmer as to credibility."

In *People* v. *Hitch, supra,* 12 Cal.3d 641, our Supreme Court adopted a rule requiring law enforcement officers to preserve material evidence gathered during the investigation of a crime. The court defined "materiality" by a standard similar to that applicable when a defendant seeks to discover the identity of a confidential informant, namely if "there is a reasonable possibility that [it] would constitute favorable evidence on the issue of guilt or innocence" then the evidence is material and there is a duty to preserve it. (*Id.,* at p. 649.)

Several cases have held that even if there may be *some* possible materiality in the missing evidence, the trial court need not impose sanctions unless the defendant makes a showing of *"substantial* materiality." (*People* v. *Chambers* (1980) 108 Cal.App.3d 985, 989-990 [166 Cal. Rptr. 815] italics added; *People* v. *Harris* (1976) 62 Cal.App.3d 859, 864 [133 Cal.Rptr. 352]; *People* v. *Wright* (1976) 60 Cal.App.3d 6, 15-16 [131 Cal.Rptr. 311].) For example in *Chambers, supra,* 108 Cal. App.3d 985, the reviewing court upheld the trial court's refusal to impose *Hitch* sanctions for the loss of tape recordings of phone conversations between the defendant and an informant and between the defendant and an undercover officer. The *Chambers* court stated: " . . . appellants made no showing that [these] telephone conversations differed in any respect from the officer's testimony of their content. In the absence of a more substantial showing of materiality, no sanctions were called for." (108 Cal.App.3d at p. 990.)

Since the defense failed to show a reasonable possibility that the missing tape had a substantial materiality above and beyond the transcript of the Klemmer interview, the trial court properly denied the motion to suppress Klemmer's testimony. (Cf. *People* v. *Ammons* (1980) 103 Cal.App.3d 20, 33 [162 Cal.Rptr. 772].)[5]

---

[5]For the first time on appeal, appellant argues that the tape might have been useful in showing that Ms. Klemmer was an accomplice to the Fuller killing. Since this theory

## Other Crime Evidence Properly Admitted

■ Appellant next contends the trial court erred in admitting evidence that one week before the subject homicide, appellant ordered Guadalupe Ramirez to kill Reggie Garcia—another enemy of Nuestra Familia. The trial court ruled the evidence was admissible to show a common scheme or conspiracy in which appellant and Ramirez played a part to kill enemies of Nuestra Familia.

Our Supreme Court has recently considered the principles governing the admissibility of evidence of uncharged offenses in *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883]. The court noted that Evidence Code section 1101, subdivision (a) does not allow evidence of a defendant's uncharged offenses to be admitted against him if *the only theory of relevance is his propensity to commit those acts*; however, subdivision (b) of that section does allow such evidence if relevant to prove some other fact in dispute such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." (Evid. Code, § 1101, subd. (b).) The *Thompson* court cautioned that even if such evidence is offered for a proper purpose under subdivision (b), a danger of undue prejudice may require exclusion of the evidence under section 352. Because substantial prejudicial effect is inherent in such evidence, uncharged offenses are admissible only if they have *substantial* probative value. If there is any doubt, the evidence should be excluded. (27 Cal.3d at p. 318.)

Nevertheless, the Supreme Court has on past occasions reiterated that evidence of uncharged offenses may be admissible to show ""'a larger continuing plan, scheme, or conspiracy, of which the present crime on trial is a part" . . .'" (*People* v. *Thomas* (1978) 20 Cal.3d 457, 464-465 [143 Cal.Rptr. 215, 573 P.2d 433]; see also *People* v. *Sam* (1969) 71 Cal.2d 194, 204-205 [77 Cal.Rptr. 804, 454 P.2d 700]). Such evidence is admissible to show a common plan where the prior offense is not too remote in time, is similar to the offense charged and is committed upon persons similar to the victim of the current offense (*People* v. *Thomas, supra,* 20 Cal.3d at pp. 465-466).

---

was not advanced below, we need not treat the argument on appeal; nevertheless, we have examined the transcript and find nothing in it which would suggest the possibility that Klemmer was an accomplice in the Fuller murder. The accomplice question does not arise as to the attempted murder of Reggie Garcia (see Pen. Code, § 1111).

The offenses in the present case were only slightly more than a week apart; hence, the remoteness factor does not foreclose admissibility.

As to the similarity of the two offenses and their respective victims, appellant contends that the circumstances of the attack on Ms. Garcia and her brother are substantially different from the instant offense. Appellant points to the following differences: (1) appellant was not a participant who was present during the murder of Fuller, whereas he did participate in the attack on Reggie Garcia, (2) in the instant offense the victim was a lone male whereas in the prior offense both Reggie and her brother were assaulted, (3) in the charged offense the victim was a member of the Aryan Brotherhood whereas the victims of the previous attack were not identified as gang members and (4) the victim in the present offense was shot, in contrast to the previous attack which was a stabbing. Appellant argues that these differences required exclusion of the evidence of the attack on Reggie Garcia and her brother.

These differences, however, were not so great as to deprive the evidence of substantial probative value. Although appellant was present during the attempt to murder Reggie and not the present homicide, in both instances he occupied a commanding role by ordering Guadalupe Ramirez to make the "hit." The fact that there was a single victim in the present case and two victims in the prior offense was mere coincidence; Reggie's brother happened to be with her when the would-be assassins found Reggie. This does not make the two offenses so dissimilar as to negate the probative value of the attempted killing of Reggie. It was clear that Reggie was the target of the Nuestra Familia attack rather than her brother because when Ramirez started assaulting the brother, appellant told him to get the girl. The victims of both the former attack and the present homicide were enemies of Nuestra Familia even though Fuller was a member of a rival gang—the Aryan Brotherhood—and Reggie may not have been a member of any gang.

We conclude that the two offenses were sufficiently similar to show a common plan or design because both offenses occurred at appellant's direction, both involved Ramirez as a hit man, both occurred in Fresno in March 1977, and both offenses were committed for the purpose of killing an enemy of the Nuestra Familia. The trial court properly exercised its discretion in admitting the evidence pursuant to Evidence Code section 1101, subdivision (b).

## No Prejudicial Misconduct in Closing Argument

Appellant next contends the prosecutor committed prejudicial error during argument to the jury when he commented on the appellant's failure to take the stand to refute evidence that he had a Nuestra Familia tattoo on his back. The prosecutor's offending remarks were: "Now, if he didn't have this on his back, why didn't you see his back? Why didn't he get up before you and say, 'I don't have that kind of tattoo ....'" Defense counsel promptly objected and the court instructed the jury to disregard the prosecutor's remarks. The court stated: "The jury will disregard that argument entirely. The ... [d]efendant has no obligation whatever to testify, as I will instruct the jury later. No obligation whatever to present any evidence whatever in this case. Any comment by the District Attorney on his failure to testify suggests that the jury should consider that which would be contrary to my instruction. You may not consider it for any purpose."

The Attorney General concedes that the prosecutor's remarks were improper under *Griffin* v. *California, supra*, 380 U.S. 609, where the United States Supreme Court held that comment on a defendant's failure to testify violates the defendant's privilege against self-incrimination.

The question then is whether the error was prejudicial. Because of its constitutional dimension, such error warrants reversal unless the court can declare beyond a reasonable doubt that the error was harmless. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) It is settled that the court reviewing *Griffin* error "'must focus upon *the extent to which the comment itself might have increased the jury's inclination to treat the defendant's silence as an indication of his guilt.'"* (Italics original, *People* v. *Vargas* (1973) 9 Cal.3d 470, 478 [108 Cal.Rptr. 15, 509 P.2d 959], quoting *People* v. *Modesto* (1967) 66 Cal.2d 695, 713 [59 Cal.Rptr. 124, 427 P.2d 788].) This rule underscores the importance of the trial court's admonition in the present case that the jury was not to consider the defendant's failure to testify for any purpose.

The California Supreme Court has also stated "in order for *Griffin* error to be prejudicial, the improper comment ... must either 'serve to fill an evidentiary gap in the prosecution's case,' or 'at least touch a live nerve in the defense, ...'" (*People* v. *Vargas, supra*, 9 Cal.3d at p. 481, quoting *People* v. *Modesto, supra*, 66 Cal.2d at

p. 714.) In the present case, the *Griffin* error does not fill an evidentiary gap. There was ample corroborating evidence of appellant's Nuestra Familia connection; both Beltran and Klemmer testified as to appellant's membership in that organization. There were also several witnesses who said they had seen appellant's tattoo; the prosecution introduced a photograph of the tattoo as well. Thus, there was no need for the prosecution to stress appellant's failure to deny that he had the tattoo. It reasonably can be said that the prosecutor's remarks did not fill an evidentiary gap for the prosecution or strike a live nerve in the defense. Moreover, the remarks were brief and were not repeated (cf. *People* v. *Morse* (1969) 70 Cal.2d 711, 730 [76 Cal.Rptr. 391, 452 P.2d 607]). We conclude the *Griffin* error was harmless.

### APPELLANT IS ENTITLED TO WORK-TIME/GOOD-TIME CREDITS

Appellant correctly contends that Penal Code sections 2900.5 and 4019 entitle him to good-time/work-time conduct credits for presentence custody. (*People* v. *Sage* (1980) 26 Cal.3d 498 [165 Cal.Rptr. 280, 611 P.2d 874].)

The judgment is affirmed. The Department of Corrections is directed to determine the presentence conduct credits, if any, to which appellant is entitled upon appellant's application for administrative determination of such credits.

Hanson (P. D.), J., concurred.

**WOOLPERT (H. E.), J.\*—**

Because the majority in this case sanction the use of character testimony which only goes to prove appellant Ruben Garnica's propensity for committing crime, I dissent. My disagreement with the majority touches only the violation of Evidence Code section 1101. I believe the other issues have been properly decided.

Appellant's evil disposition and tendency to commit crime is well documented in the trial transcript. The case against him was already strong when the prosecution convinced the trial judge that a dissimilar prior murder attempt should be admitted. The trial judge, in a hearing outside the presence of the jury, heard the prosecutor's offer of proof,

---

\*Assigned by the Chairperson of the Judicial Council.

argument of appellant's counsel, went through the weighing process required by Evidence Code section 352 and permitted evidence of prior uncharged wrongdoing by appellant. The effect was devastating and, because the trial court erroneously admitted the evidence, the case should be remanded for a new trial.

The trial judge found foundational evidence indicated appellant and the "hit man" were part of a Fresno conspiracy to enforce the program of Nuestra Familia, their gang, in eliminating its enemies by murdering them. He went on to say: "And it seems to me that this would be very material evidence to the existence of such a conspiracy and such a relationship. With the assurance that this is the only one [prior uncharged offense] that you're [the prosecution is] going to offer, I will overrule the [appellant's] objection and find that it is—though it is obviously prejudicial material, that it's—it's [sic] usefulness in determining the central issue in this case is so important that I'll allow it in."

The crime with which appellant was charged was murder of one Fuller in March 1977. Appellant and the "hit man" had a minor confrontation with Fuller in a store, and appellant later ordered the "hit man" to kill Fuller, whom appellant felt was a member of the Aryan Brotherhood, an enemy gang. The "hit man" received a revolver from appellant and, with an accomplice, used it to gun down Fuller on a Fresno boulevard. Appellant was not present at this killing.

The same "hit man" who killed Fuller testified over objection that a week before Fuller's murder, appellant commanded him to kill a woman who had testified against a Nuestra Familia member. On this occasion the "hit man," appellant and two accomplices found the woman and her brother on the street. While appellant told the "hit man" to get the woman, appellant stayed aloof from the affray while the others wielded knives on the two victims, leaving the woman for dead. She did not die.

Appellant did not testify, but his argument was essentially that crimes committed by the "hit man" had no connection with him.

Chief Justice Bird in *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883] counselled trial judges that when the prosecution attempts to admit into evidence prior uncharged conduct, the trial judge must, as with other circumstantial evidence admissibility problems, determine: "(1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove

or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence." (*Id.*, at p. 315.)

The attempt to kill the female "stoolie" shows appellant's propensity for crime and a disposition to commit crime. But if such character trait evidence has as its only materiality the showing of such propensity and disposition, Evidence Code section 1101, subdivision (a) forbids the use of "evidence of a person's character or a trait of his character ... when offered to prove his conduct on a specified occasion."

While the law forbids the use of character or disposition evidence to prove conduct on a specified occasion, section 1101, subdivision (b), permits the admission of a defendant's commission of a crime "when relevant to prove some fact ... other than his disposition to commit such acts," and the section lists examples.

The trial court made no cautionary or limiting instruction at the time the jury first heard the "hit man" testify concerning the uncharged offense. The judge did instruct the jury at the close of argument in the language of CALJIC No. 2.50 (1977 rev.) as to the other crimes evidence being received only for the limited purpose of determining if it showed (1) a necessary intent involved in the charged crime, (2) a motive, or (3) the existence of a conspiracy.[1]

It is difficult to understand how appellant's intent was a *material* issue. The defense was appellant gave no command, but if he ordered Fuller's death via the "hit man," such a venture can hardly be excused by a claim of mistake, or no intent to kill, or a lack of premeditation and deliberation. If the jury believed appellant gave the command, no ambiguous conduct or intent needs to be explained by an introduction

---

[1]The trial court instructed the jury as follows: "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.

"Such evidence was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes.

"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

"A motive for the commission of the crime charged;

"The existence of the intent which is a necessary element of the crime charged;

"The existence of a conspiracy.

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

"You are not permitted to consider such evidence for any other purpose." (Brackets omitted.)

of the prior crime. Since intent was not a *material* issue, the prior crime's admissibility cannot be justified on that theory (*People* v. *Thompson, supra,* 27 Cal.3d 303, 315).

This leaves motive and conspiracy or plan or scheme. The inference raised by a conspiratorial plan or scheme is similar to that raised by evidence of motive. The reasoning must be that appellant had a conspiratorial plan or scheme which included within its scope a desire to commit the charged crime pursuant to consummation of the plan; therefore, appellant probably commanded Fuller's death to fulfill the object of the plan, elimination of Nuestra Familia enemies.

The logical problem caused by the analysis here is that the conspiratorial plan or scheme did not include within its scope the particular crime here charged, i.e., Fuller's murder. What is actually proved is that appellant had a general plan to eliminate Nuestra Familia's enemies by killing them. This general disposition or propensity to eliminate the gang's enemies is shown by the prior killing of the female "stoolie." The plan or scheme to kill her was actually completed when the stabbing occurred, and was foiled only by her fortunate survival.

Appellant's motive for causing Fuller's death is shown by the evidence in the case without reference to the prior attempted killing. Even assuming, however, it is not, evidence of the prior attempted murder was not logically connected to the present motive. If the motive for attempting to kill the female "stoolie" was to eliminate her as a gang enemy, the most logical inference is the motive dissipated when that crime ended. Appellant's motive to kill Fuller arose only when appellant began to perceive him as an enemy.

In the language of *Thompson, supra,* 27 Cal.3d at page 316, the trial court: "'must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter chain of inference between the former and the latter is reasonably strong.' [Citation.] If the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." (Fn. omitted.)[2]

---

[2]The rough-and-tumble of a jury trial is no place to expect a trial judge to make the contemplative decision apparently expected. The amount of time I expended in reach-

Here I find the connection between the charged offense and the uncharged offense on either motive or plan or scheme to be a weak link. The other crimes evidence here is an outright violation of Evidence Code section 1101, subdivision (a). The evidence of a general plan or scheme to murder Nuestra Familia "enemies" really shows no more than a disposition to harm people perceived as enemies, rather than a specific and purposeful plan which included among its objects the specific crime charged. Therefore, the evidence should have been excluded.

Even assuming the similarity between the two crimes was strong enough to satisfy the relevancy requirement of *Thompson*, as showing either motive or plan or scheme, the evidence should have been excluded because the evidence did not have substantial probative value and whatever probative value it did have did not outweigh its prejudicial effect. (Evid. Code, § 352.) The prejudice created by the attempted murder of the female "stoolie" seems obvious, but should at least be clearly stated. The "hit man" had testified to carrying out appellant's command regarding Fuller, and other witnesses as well testified to the organization of Nuestra Familia and the powers allocated to one of its lieutenants, a title attributed to appellant. To expect a juror to hear this testimony, and then use the attempted murder evidence, at which appellant was supposed to have been present and participated verbally, only for the purpose of showing plan or scheme or motive is to overwhelm credulity. The weakness of the probative value of the inference from plan or scheme or motive is substantially outweighed by the prejudicial effect of such evidence.

Because of the erroneous admission of the uncharged offense, I am of the view it was reasonably probable the jury would have reached a result more favorable to appellant except for the error. Thus, the

---

ing my conclusions would never have been available to me had I been in the position of the trial judge. I suspect I would have reached the same conclusion as he, even though I now reach an opposite conclusion.

Trial judges may well want to require prosecutors to at least forwarn the court and counsel of any Evidence Code section 1101 problems before a jury is even present, and look askance, at least, at the use of any uncharged misconduct where no notice has been given. Perhaps trial judges should only allow evidence of prior misconduct when notice has been given by the prosecution a reasonable time prior to trial. (See Pen. Code, § 190.3, which states in part that "no evidence [of prior misconduct other than that of the offense charged or special circumstances] may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial.")

judgment should be reversed for a new trial. (*People* v. *Thompson, supra*, 27 Cal.3d 303, 333; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

A petition for a rehearing was denied August 18, 1981, and appellant's petition for a hearing by the Supreme Court was denied October 15, 1981. Bird, C. J., was of the opinion that the petition should be granted.