[Civ. No. 23969. Third Dist. Nov. 8, 1985.]

RONALD E. SCOTT, Plaintiff and Appellant, v.
GEORGE E. MEESE, as Director, etc., Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to rule 976.1 of the California Rules of Court, the Reporter of Decisions shall publish all portions of this opinion except parts II, III and IV, which shall not be published.

250

COUNSEL

Estelle A. Schleicher for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Robert Burton and Ted Prim, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**SPARKS, J.**—In the published portion of this opinion, we consider whether the principles of *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], and *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], apply in administrative proceedings. We hold that they do. On the merits, however, we find no violation of those principles in this case.

Ronald E. Scott appeals from a judgment denying his petition for a peremptory writ of mandate to prevent the Department of Motor Vehicles from suspending his driver's license pursuant to the implied consent law of Vehicle Code section 13353. Scott contends that the hearing officer committed reversible error by denying his motion to strike the arresting officer's testimony of his refusal to complete the test because a tape recording of the officer's admonitions and Scott's response had been inadvertently erased. As we shall explain, such a drastic sanction was inappropriate in this case and consequently the hearing officer properly denied the motion to strike the officer's testimony. In the unpublished portion of our opinion, we examine and reject Scott's remaining contentions.

### BACKGROUND AND FACTS

Where a person has been lawfully arrested on probable cause to believe that he has been driving a vehicle while under the influence of

alcohol, then even the forcible, nonconsensual removal of a sample of his blood for testing does not offend the state or federal Constitutions, provided it is done in a medically approved manner. (*People v. Superior Court (Hawkins)* (1972) 6 Cal.3d 757, 764 [100 Cal.Rptr. 281, 493 P.2d 1145]; *People v. Bloom* (1983) 142 Cal.App.3d 310, 317 [190 Cal.Rptr. 857]. See also *Schmerber v. California* (1966) 384 U.S. 757, 770-771 [16 L.Ed.2d 908, 919-920, 86 S.Ct. 1826].) Nevertheless, such an episode may be unpleasant, undignified, and undesirable. To avert these offensive episodes, the Legislature has provided an alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication by mandating that such a person will lose his driver's license for an appropriate period, the length of which depends upon his prior record, if he refuses to submit to a test for intoxication. (Veh. Code, § 13353; see *People v. Superior Court (Hawkins), supra,* 6 Cal.3d at pp. 764-765.) This statutory scheme was enacted to provide a fair, efficient and accurate system to detect and prevent drunk driving. (*Hernandez v. Department of Motor Vehicles* (1981) 30 Cal.3d 70, 77 [177 Cal.Rptr. 566, 634 P.2d 917]; *Kesler v. Department of Motor Vehicles* (1969) 1 Cal.3d 74, 77 [81 Cal.Rptr. 348, 459 P.2d 900].) Under the statute, the arrested person's consent to chemical testing is deemed to be implied from the act of driving a motor vehicle. (Veh. Code, § 13353, subd. (a)(1).) Such a person must be informed that a refusal, or the noncompletion of, a chemical test will result in a license suspension. (Veh. Code, § 13353, subd. (a)(1).) The arrested person has the choice of submitting to blood, breath or urine testing, and must be so informed. (Veh. Code, § 13353, subd. (a)(2)(A).) If the person is incapable, or states that he is incapable, of completing any chosen test, the person has the choice of submitting to and completing any of the other tests, and must be so advised. (Veh. Code, § 13353, subd. (a)(2)(A).)

When the Department of Motor Vehicles proposes to suspend a person's driving privilege pursuant to the implied consent law, the person is entitled to an administrative hearing. (Veh. Code, § 13353, subd. (c)(1).) At the hearing the issues are: (1) whether the arresting officer had reasonable cause to believe the person had been driving a motor vehicle while under the influence of alcohol or alcohol and drugs; (2) whether the person was placed under arrest; (3) whether the person refused to submit to, or did not complete, the test or tests after being requested by a peace officer; and (4) whether the person had been told that his driving privilege would be suspended or revoked if he refused to submit to, or did not complete, the test or tests. (Veh. Code, § 13353, subd. (c)(1).)

This case began in the evening of December 22, 1982, when Officer Larry Blevins of the California Highway Patrol stopped Scott for illegally driving his vehicle approximately 75 miles per hour and crossing into the lanes of

other motorists. The officer detected an odor of alcohol from Scott's breath, noted that his speech was slurred and observed that his eyes were bloodshot. Scott was placed under arrest for driving under the influence of intoxicating liquor. (Veh. Code, § 23152, subd. (a).) For purposes of his administrative hearing, Scott stipulated that the arresting officer had reasonable cause to believe he had been driving while under the influence of alcohol, and that he was lawfully arrested. The evidence was thus limited to whether Scott refused or failed to complete a chemical test after being requested to do so, and whether he had been informed that a refusal or failure would result in license suspension.

Officer Blevins testified at the hearing that he informally advised Scott at the arrest location that he would be required to submit to a blood, breath or urine test, and that if he refused his driving privilege would be suspended for six months. Scott replied that he would decide upon arrival at the sobriety testing station. Upon arrival at the station Scott was shown an implied consent sign posted on the wall at the entrance and he indicated he wanted the urine test. Officer Blevins advised him that the urine test would require that he give a specimen and then 20 minutes later he would be required to give a second specimen and that if he did not give the second specimen he would then be required to submit to a blood or breath test. Scott said he understood.

Scott was taken into the lavatory and given a specimen jar. He initially provided a sample which was not sufficient to wet the preservative in the bottom of the jar. Blevins handed him back the jar and told him he would have to produce more. He then provided a sample of approximately one-quarter to one-third of the jar, which was sufficient. Approximately 20 minutes later Officer Blevins began to lead Scott back to the lavatory and Scott stated that he would not provide another specimen. He took the position that he had completed the test. Blevins advised him that he had to provide a second sample to complete the test, but he still refused. Blevins took Scott to his patrol car, turned on a tape recorder and then formally advised him of the implied consent law by reading the Department of Motor Vehicles standard form. The officer explained that he undertook this precaution because the departmental form was more complete than the posted sign at the station. Scott concedes that the officer read the form to him. In this admonition, Scott was told that he "was required by state law to submit to a chemical test to determine the alcoholic content of your blood. You have a choice of whether the test is to be of your blood, breath or urine. If you refuse to submit to a test or fail to complete a test, your driving privileges will be suspended for six months. . . . If you are incapable, or state you are incapable, of completing the test you choose, you must submit to and complete any of the remaining tests or test." Scott agreed to attempt to

complete the test and was taken back to the lavatory. After a lapse of five minutes he said he could not give another sample. Blevins advised him he would have to take one of the other tests but Scott gave him a look of disdain and started to walk out. Blevins asked him whether he would take a blood test or a breath test, and he stated "no" to each.[1] Officer Blevins further testified that the tape recording of Scott's refusal was no longer available. He explained that he recorded Scott's refusal on his partner's tape recorder, but his partner inadvertently recorded another refusal over Scott's tape. Blevins had been off work the day following Scott's arrest, and when he later went to make a copy of the tape of Scott's refusal, he discovered that the tape had been reused. The officer conceded that he had not taken any steps to preserve the tape recording on the evening of Scott's arrest.

Scott's version was slightly different. He testified that he recalled being given the choice of the three types of tests, and that he was encouraged to take the breath test. He selected the urine test because he wanted it done by a person and not a machine. He was informed that he would have to produce two samples. On his first attempt he produced approximately an ounce of urine, and Blevins told him he would have to produce more. He formed the opinion in his own mind that he was producing the second sample at that time. When Blevins later asked for another sample, he concluded he was being asked for a third sample. Blevins took him to the car and read the implied consent admonishment form provided by the Department of Motor Vehicles. Although he believed he had already furnished two samples, he nevertheless agreed to attempt to provide a third urine sample. He was unable to do so, and Blevins told him he would have to take the breath test or lose his license. According to Scott, on this occasion Blevins said nothing about a blood test. Thus, Scott inferentially denied that he had refused to take a blood test but impliedly admitted he refused a breath test. He claimed that if the officer had given him the option of taking a blood test, he would have taken it. This testimony concerning the blood test is the only significant conflict between Scott's version and Officer Blevins' account of the incident.

### DISCUSSION

### I

Pointing to the erased tape and relying upon People v. Hitch, supra, 12 Cal.3d 641, Scott contends that the attempt to suspend his driver's license

---

[1] In his report Officer Blevins stated that during the taking of the first urine sample Scott had been verbally abusive, calling the officer an "asshole" and "stupid bastard." In response, Officer Blevins tape recorded the second attempt session. When Scott refused to provide the second sample, he became loud and began screaming, "Don't hit me. Don't push me against the wall. What are you doing to me." This was apparently for the benefit of the tape recorder. Blevins noted in his report that Scott "attempted to make it sound like he was being manhandled, which he wasn't."

should have been dismissed, or, at a minimum, Officer Blevins should not have been allowed to testify. He claims that there is a reasonable probability that the erased recording would have been favorable to him and that there was no showing that the police authorities had established a systematic procedure designed to preserve the tape recording.

As the California Supreme Court later recounted, it held in *Hitch* that "the federal guaranty of due process requires the People to *preserve* breathalyzer ampoules in their possession for later retesting by defendants charged with driving while intoxicated." (*In re Michael L.* (1985) 39 Cal.3d 81, 85-86 [216 Cal.Rptr. 140, 702 P.2d 222]; italics in original.) The *Hitch* court reasoned that the federal due process requirement that the prosecution in a criminal case disclose all material evidence to the accused places upon it the correlative duty to take reasonable steps to preserve material evidence which it has gathered. (12 Cal.3d at p. 650; see also *People v. Nation* (1980) 26 Cal.3d 169, 175 [161 Cal.Rptr. 299, 604 P.2d 1051].) "When the evidence is no longer in existence, the burden of establishing that the evidence is material is met when the defendant shows that there is 'a reasonable possibility that the evidence, if preserved, would have constituted favorable evidence on the issue of guilt or innocence.'" (*People v. Moore* (1983) 34 Cal.3d 215, 220 [193 Cal.Rptr. 404, 666 P.2d 419], citations omitted.) Accordingly, where material evidence cannot be disclosed because it was destroyed, sanctions may be imposed for the destruction. (*Hitch*, at p. 650.) The imposition and mode of sanctions depends upon the particular circumstances attending the loss or destruction of the evidence. (*Ibid.*) In *Hitch* it appeared that after administering breath tests to suspected drunken drivers, police agencies routinely destroyed the glass ampoules and their chemical contents, which were relevant evidence on the accuracy of the particular test. (*Id.,* at pp. 644-645.) The Supreme Court held that the intentional but nonmalicious destruction of such evidence would require the exclusion of the test results in the future, unless the agency showed that it established and attempted to adhere to rigorous and systematic procedures designed to preserve such evidence. (*Id.,* at pp. 652-653.)

The parties dispute whether the rule of *Hitch* is applicable in administrative proceedings. Scott relies upon our decision in *Kolnick v. Board of Medical Quality Assurance* (1980) 101 Cal.App.3d 80, at page 86 [161 Cal.Rptr. 289], for the proposition that *Hitch* applies in such proceedings. There an investigatory agency attempted to tape record conversations but the tapes were blank or incomprehensible and were recycled. We assumed that *Hitch* would apply, but found that the failure to preserve the blank or incomprehensible tapes did not warrant sanctions. The Department correctly points out that our statement concerning *Hitch* was dictum since even under

that decision we found no sanction necessary. The Department urges that we now find *Hitch* to be inapplicable to administrative proceedings.

■ We cannot accept the Department's suggestion that the reasoning of *Hitch* is inapplicable to administrative agencies. *Hitch* stated a specific rule which is applicable where its particular facts are at issue, and otherwise stated general principles of due process. The purpose of administrative hearings, such as those held under the implied consent law, is to provide due process to a person who is potentially subject to administrative sanctions. (See *Anderson* v. *Cozens* (1976) 60 Cal.App.3d 130, 140 [131 Cal.Rptr. 256], and cases cited there.) It would be anomalous to hold that a person who faces suspension of his driver's license is entitled to procedural due process, but that the principles of due process relating to the integrity of the fact-finding function do not apply simply because they were enunciated in a criminal case. That anomaly aside, it is simply too late in the day to argue that fundamental principles of due process do not apply to administrative proceedings. (See generally, 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 299, p. 3588 et seq.; 2 Cal.Jur.3d, Administrative Law, § 155, p. 382; Comment, *California and Federal Administrative Due Process: Development, Interrelation and Direction* (1972) 5 U.C. Davis L.Rev. 1.) The short answer is that the destruction of favorable evidence may deny the licensee's right to a fair hearing and "[d]ue process requires that administrative hearings be full and fair." (*Button* v. *Board of Administration* (1981) 122 Cal.App.3d 730, 738 [176 Cal.Rptr. 218].)

Having concluded that it applies in administrative hearings, we next consider whether *Hitch* survives in its entirety after the United States Supreme Court's decision in *California* v. *Trombetta, supra,* 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528]. As the California Supreme Court recently noted, "[i]t is apparent that the *Trombetta* formulation of the duty-to-preserve test differs substantially from our own *Hitch* standard." (*In re Michael L., supra,* 39 Cal.3d at p. 86.) That court further noted that in *Trombetta* "the United States Supreme Court addressed for the first time the People's duty under the due process clause of the Fourteenth Amendment to take affirmative steps to preserve evidence. Although the high court acknowledged our effort in *Hitch* to define the duty imposed by the federal Constitution . . ., it formulated its own test describing the contours of the obligation: 'Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means.'" (*Ibid.;* citation omitted.) ■ Under the su-

premacy clause, the United States Supreme Court's construction of federal constitutional rights is binding on all courts of the land. (U.S. Const., art. VI, cl. 2; *South Carolina* v. *Bailey* (1933) 289 U.S. 412, 420 [77 L.Ed. 1292, 53 S.Ct. 667]; *Calderon* v. *City of Los Angeles* (1971) 4 Cal.3d 251, 258 [93 Cal.Rptr. 361, 481 P.2d 489]; see also 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 673, pp. 4586-4587.) Thus, to the extent that *Hitch* conflicts with *Trombetta,* and so long as *Hitch* is solely based upon the federal constitution, it has been abrogated by *Trombetta.* ▉ Nevertheless, the core duty to preserve constitutionally material evidence under the due process clause of the Fourteenth Amendment remains and that duty applies to administrative hearings.

Because the parties have not addressed the question, we assume but do not decide that the erased tape recording was constitutionally material. Although both the officer and the licensee could testify about the contents of the tape recorded conversation, that conflicting testimony may not be "comparable evidence" within the meaning of *Trombetta.* Whether comparable evidence is obtainable by other reasonable means no doubt varies with the circumstances of each case. For example, a neutral third party may have overheard the conversation and be able to recall its contents precisely. But for the purposes of this case, we assume comparable evidence was not obtainable.

The holding in *Trombetta* was that "the Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce breath-analysis tests at trial." (*Id.,* 467 U.S. at p. 491 [81 L.Ed.2d at p. 423]; fn. omitted.) The high court consequently did not have occasion to decide the question of appropriate sanctions in the event a police agency inadvertently breached its duty to preserve constitutionally material evidence. Since there is no conflict with *Trombetta* on that point, *Hitch* remains authoritative on the question of sanctions.

Moreover, apart from due process concerns, *Hitch* explains that the destruction of material evidence may be tantamount to suppression or nondisclosure of such evidence. Whether a proceeding be denominated criminal or civil, the suppression or nondisclosure of material evidence to which the opposing party has a right may result in sanctions. (Code Civ. Proc., § 2034. See generally Witkin, Cal. Evidence (1966) Discovery and Production of Evidence, §§ 1016-1034, pp. 938-948.) In fact, both before and after *Hitch,* courts have assumed that the suppression of material and substantial evidence in an implied consent context could result in sanctions. (See e.g., *Martin* v. *Department of Motor Vehicles* (1976) 54 Cal.App.3d 903, 908 [126 Cal.Rptr. 924]; *Noll* v. *Department of Motor Vehicles* (1969) 274 Cal.App.2d 281, 286-287 [79 Cal.Rptr. 236].)

Our conclusion that the principles of *Hitch,* as modified by *Trombetta,* govern this case does not end the matter. A person may not simply point to some missing or unavailable evidence, cite *Hitch,* and thereby escape the consequences of his conduct. ■ When substantial material evidence has been lost or destroyed sanctions may be appropriate, but the imposition and mode of sanctions depend upon the circumstances attending the loss or destruction of the evidence. (*Hitch, supra,* 12 Cal.3d at p. 650.) Consequently, courts have a large measure of discretion in determining the appropriate sanction that should be imposed due to the loss or destruction of discoverable records or evidence. (*People* v. *Zamora* (1980) 28 Cal.3d 88, 99 [167 Cal.Rptr. 573, 615 P.2d 1361].) In the absence of bad faith, the sanction imposed should not be more than is necessary to insure the accused a fair trial. (See *People* v. *Bailes* (1982) 129 Cal.App.3d 265, 272-273 [180 Cal.Rptr. 792].) In the civil procedure area it has been said that a court should not impose a sanction that is too "drastic" for the circumstances. (*Crummer* v. *Beeler* (1960) 185 Cal.App.2d 851, 860 [8 Cal.Rptr. 698].)

■ In this case neither the "dismissal" of the administrative proceeding, nor the exclusion of Officer Blevin's testimony, which is tantamount to the same thing, would be an appropriate sanction. Here there was no evidence of a conscious effort to suppress exculpatory evidence. Blevin, apparently on his own initiative, borrowed his partner's tape recorder to record Scott's refusal to submit to or complete a chemical test. He then inadvertently allowed the recording to be destroyed when his partner used the same tape to record another refusal. This loss of evidence was negligent. But nothing in the record suggests that it was intentional or in bad faith on Blevin's part. Further, the loss of the tape did not deprive Scott of his ability to make his defense. Both of the participants to the transaction were available to testify and be cross-examined with regard to it. In fact, the loss of the tape left Scott in exactly the same position as most persons charged with violating the implied consent law where peace officers have not exercised the initiative to record refusals. This is not to say that having decided to record the conversation Blevins had no duty to take reasonable steps to preserve it; it is simply to say that the windfall sanction sought by Scott is too drastic a remedy for the wrong. Scott was permitted to establish that the tape recording was destroyed and the circumstances under which this occurred. This was adequate to insure a fair hearing and was itself a sufficient sanction. (See *People* v. *Bess* (1984) 153 Cal.App.3d 1053, 1058-1059 [200 Cal.Rptr. 773], suggesting the proper sanction for the negligent loss of film would be to inform the jury of its destruction; *People* v. *Bailes, supra,* 129 Cal.App.3d 265, 273, holding a jury instruction to be appropriate remedy for the loss of a photograph; *People* v. *Garnica* (1981) 121 Cal.App.3d 727, 733 [175 Cal.Rptr. 521], holding no sanction necessary for loss of a tape recording where a partially complete transcript was available; *People*

v. *Ammons* (1980) 103 Cal.App.3d 20, 33 [162 Cal.Rptr. 772], no sanction necessary for loss of tape recordings where the tapes could be used only to impeach an officer's testimony and all parties involved in the conversations testified.)[2] This is particularly true in this case where the licensee concedes he was advised of his right to take either a blood or breath test if he was incapable of completing the urine test and the destroyed tape only related to whether he was later readvised of his right of selection. Given these facts, the trial court properly declined to issue a writ of administrative mandate compelling the Department to set aside its decision to suspend Scott's driver's license.

II-IV*

. . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Carr, Acting P. J., and Sims, J., concurred.

---

[2]In *United States* v. *Augenblick* (1969) 393 U.S. 348 [21 L.Ed.2d 537, 89 S.Ct. 528], relied upon by the court in *Hitch,* a serviceman had been dismissed from the service after being found to have committed an indecent act with another serviceman. Tape recordings of the questioning of both participants were lost under circumstances that indicated negligence rather than bad faith suppression. The Court of Claims found the denial of discovery of the recordings to be a violation of due process and entered an award of backpay. The Supreme Court reversed. Speaking for a unanimous court, Justice Douglas noted that in some circumstances the denial of discovery might implicate constitutional principles, "[b]ut certain it is that this case is not a worthy candidate for consideration at the constitutional level." (393 U.S. at p. 356 [21 L.Ed.2d at p. 545].)

*See footnote, *ante,* page 249.